<table>
<tr><td>

**UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY**

</td></tr>
<tr><td>

**McMANIMON, SCOTLAND & BAUMANN, LLC**
75 Livingston Avenue, Second Floor
Roseland, New Jersey 07068
Anthony Sodono, III (asodono@msbnj.com)
Sari B. Placona (splacona@msbnj.com)
*Proposed Counsel to Ashley Stewart, Inc.,*
*Chapter 11 Debtor and Debtor-in-Possession*

</td></tr>
</table>

|  |  |
|---|---|
| In re: | Chapter 11 |
| ASHLEY STEWART, INC., | Case No.: 25-23314 |
| Debtor. | |

## DECLARATION OF RAM AJJARAPU IN SUPPORT OF CHAPTER 11 FILING

**RAM AJJARAPU**, of full age, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury that I am authorized to submit this Declaration and certify and declare as follows:

1.       I am a director on the Board of Directors (the "Board") of Ashley Stewart, Inc. (the "Debtor" or "Ashley Stewart"), the Chapter 11 Debtor and Debtor-in-Possession. There is a three-member Board consisting of myself, Julia Klyashtorny ("Julia") and Adam Zalev ("Mr. Zalev"). On or about December 10, 2025, the shareholders of Ashley Stewart elected Julia and me as directors to the Board.  Mr. Zalev is an independent director of the Board, unaffiliated with any insiders, and has no financial or familial relationship with any insiders or their affiliates. I am fully familiar with the Debtor's business and financial affairs, including the facts and circumstances set forth herein.

2.       Except as otherwise indicated, the facts set forth in this Declaration are based on my personal knowledge, information learned from my review of relevant documents, including financial information, or my opinion based upon my experience and knowledge of the Debtor's current operations and financial condition. This Declaration is intended to provide a brief

background of the Debtor, a description of its assets, business and financial situation, the reasons

for the Chapter 11 filing, the Debtor's objectives in the Chapter 11 process, and a summary of the

relief sought.

3.       If called as a witness in this bankruptcy proceeding, I could and would testify to the

best of my knowledge competently to the facts set forth in this Declaration. Unless otherwise

indicated, all financial information set forth in this Declaration is presented on an unaudited basis.

4.       Pursuant to a Stockholders' Written Consent dated December 10, 2025, holders of

a majority of the Debtor's outstanding voting stock reconstituted the Board and authorized the

filing of this Chapter 11 case. The reconstituted Board approved and ratified the filing in

accordance with the amended by-laws and applicable law.

5.       For clarity, the Debtor is a non-operating company. As discussed below, the

Debtor's assets and operations were sold and are currently being operated by G Ashley (defined

and described herein).  That said, however, certain leases that were to be transferred via the sale

have not yet been transferred.  Moreover, certain bank accounts in which G Ashley's funds are

being deposited remain in possession, custody and control of the Debtor.  The Debtor is prepared

to work with G Ashley so it can utilize the funds in the ordinary course of G Ashley's business so

as not to disrupt operations.   As discussed more fully below, the Debtor seeks to recover the assets

sold to G Ashley to benefit its creditors.

6.       Upon information and belief, there is no injunction, court order, or corporate

governance document restricting the Board or the majority stockholders from authorizing this

Chapter 11 filing.

2

7.      I submit this declaration (the "Declaration") in support of the Debtor's voluntary petition for relief under Chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") and the relief the Debtor has requested from the Court.

8.      The Debtor filed its voluntary Chapter 11 bankruptcy petition (the "Petition") on December 17, 2025 (the "Petition Date").[1]  ECF 1. Founded in 1991, the Debtor *was* a leading plus-size fashion retailer operating 76 boutiques across more than 20 states with a substantial e-commerce platform. The Debtor's assets were purportedly sold on November 20, 2025, to G Ashley Inc. ("G Ashley").  Consequently, the Debtor's current state consists of minimal assets. The Debtor, however, while currently non-operating, is simultaneously or shortly thereafter, filing an adversary proceeding to recover the assets that were sold to G Ashley, asserting that the transaction was unlawful and should be void.

9.      As noted, although G Ashley purportedly assumed the store leases via the sale from the Debtor, upon information and belief, the lease assignments for all of the 76 stores have not been finalized conveying the leases from the non-operating Debtor to G Ashley. Therefore, the emergent need for the bankruptcy filing is to (1) address the Debtor's request to void the sale to G Ashley and recover the assets, and (2) halt the transfer of leases, all for the benefit of the Debtor's creditors.

10.      Crucially, despite the purported 'closing' of the sale, the Debtor remains in physical and operational control of the business through its bank accounts. Cash collections from all 76 stores continue to be deposited directly into the Debtor's ten bank accounts and the complex financial and technological infrastructure required to run the business remains solely in the

---

[1] Annexed as **Exhibit S** is a Written Consent and Resolution of the Board of Directors of Ashley Stewart, Inc. to Authorize Chapter 11 Voluntary Bankruptcy Petition, in which a majority of the Debtor's Board voted in favor of filing for bankruptcy as authorized under the by-laws. ECF 1.

3

Debtor's name. This includes a Private Label Credit Card (PLCC) program through Bread Financial generating approximately $25 million in annual revenue, and Buy Now, Pay Later (BNPL) operations through Afterpay generating approximately $20 million in annual revenue. The transition of these financial systems is not instantaneous; for example, Bread Financial requires approximately sixty (60) days to migrate, and Afterpay requires approximately thirty-six (36) days to migrate to G Ashley. Additionally, the Debtor maintains exclusive control over other mission-critical systems that G Ashley cannot immediately replicate, including First Data Corporation for gift card processing (approx. 60 days), Ceridian (Dayforce) for payroll processing (approx. 48 days), Aurus for store data gateways (approx. 48 days), Adyen for payment gateways (approx. 36 days), and Avalara for sales tax compliance (approx. 30 days). These are not simple vendor contracts; rather, they are integrated financial and operational processing agreements involving strict regulatory compliance, credit underwriting, and lengthy migration timelines that cannot be summarily assigned to G Ashley without extensive third-party consent. As G Ashley lacks these critical assets and the necessary lead time to implement them, the Debtor remains the only entity capable of maintaining the G Ashley business as a going concern.

11.     This Chapter 11 case was commenced to preserve estate assets, enforce the automatic stay under section 362 of the Bankruptcy Code, preserve going-concern value, seek turnover of property of the estate under section 542, and ensure the equal and orderly treatment of creditors under the supervision of this Court.  Certain creditors were excluded and prejudiced by the distribution of funds from the G Ashley sale.  Only through a Chapter 11 can such creditors recover what they are entitled to.

12.     The Debtor's assets were purported to be transferred through a UCC Article 9 foreclosure sale orchestrated by the Debtor's lender, Wingspire Capital ("Wingspire"), under the

4

influence of former insider management, Samarth Gupta and Sarika Gupta (collectively the "Guptas"). This disputed sale, which favored a disguised insider entity (G Ashley Inc.) and excluded bona fide higher offers, has stripped the Debtor of its primary value thereby harming creditors. State court remedies are wholly inadequate because they cannot effectively unwind a multi-state fraudulent transfer or stay actions against the Debtor's 76 boutiques across 20 plus jurisdictions. Only this Court can provide the centralized relief necessary to impose the automatic stay, adjudicate the Debtor's colorable claims for turnover under § 542, and recover the Estate's assets for the benefit of all creditors.

### **Background**

13.     The Debtor has commenced this Chapter 11 case to preserve going-concern value, prevent further dissipation of assets, and protect the interests of creditors and other stakeholders.

14.     The Debtor has asserted and intends to pursue meritorious claims under the Bankruptcy Code and applicable non-bankruptcy law, including claims for turnover, avoidance of fraudulent transfers, and equitable relief related to the Article 9 Uniform Commercial Code ("UCC") auction-sale of the Debtor's assets, as further detailed below.

15.     I am the trustee and beneficiary of the Aruna Ajjarapu Trust, which is the sole shareholder of Global Information Technology, Inc. ("GIT"), the owner of a forty percent (40%) member-interest in Kinbow, LLC ("Kinbow"). Indigomoon, LLC ("Indigomoon")[3] owns the remaining sixty percent (60%) of Kinbow. In turn, Kinbow owns ninety percent (90%) of the Debtor. The authority for this filing is rooted in the true equitable ownership of the capital invested into Indigomoon. While Samarth Gupta ("Samarth") claims control of Indigomoon, the actual capital contribution for the acquisition came from GK Trading LLC, a wholly owned subsidiary of Apparel Solutions Inc. Because Apparel Solutions is owned 50/50 by Julia and Samarth, the

5

funds used to purchase the Debtor were jointly owned in equal measure. Upon information and belief, Samarth engaged in two distinct acts of fraud to seize control of this joint capital:

i)      Dilution of Equity: Samarth misappropriated the 50/50 funds from GK Trading to Indigomoon and unilaterally granted his wife, Sarika Gupta, a 16.8% interest in Indigomoon for no consideration, solely to dilute Julia's interest to 41.6% (as admitted in Samarth's email attached as **Exhibit A**).[2]

ii)     Forgery of Operating Documents: To fabricate control over the funding source, Samarth forged Julia's signature on an amendment to the GK Trading operating agreement, purporting to increase his stake to 52%. This document is a verifiable forgery that was never executed by Julia; notably, the perpetrator misspelled Julia's own surname on the signature page a clear indicium of fraud.

16.     Pursuant to the Kinbow Operating Agreement, Julia, Samarth, and I are the members of the Management Board. According to Section 3.03, in order to file a voluntary petition in bankruptcy, it requires Sufficient Voting Interest. Julia and I make up two-thirds of the board and thus, this constitutes Sufficient Voting Interest.

17.     The Debtor asserts that Sarika Gupta's purported 16.8% interest is the 'fruit of the poisonous tree,' derived solely from the misappropriation of Julia's capital. But for this fraud, Julia is the rightful holder of a controlling interest in Indigomoon. Accordingly, the Stockholders' Written Consent executed by Julia (on behalf of Indigomoon) and myself (on behalf of GIT) constitutes a valid authorization by the majority of the true equitable owners of the Debtor.

---

[2] Exhibit A is an email from Samarth, dated February 27, 2025, concerning 2024 tax returns for business entities in which he holds an ownership interest. In this correspondence, Samarth asserts that Sarika possesses a purported approximate 16.8% member-interest in Indigomoon. This assertion is inconsistent with Julia's understanding and agreement that Indigomoon was to be owned exclusively and equally by Samarth and Julia.

18.     Two weeks before the closing of the acquisition of the Debtor by G Ashley, Samarth incorporated Kinbow, stating that the ownership would mirror that of Kinbow IM, however, it did not. Days later, Samarth incorporated Indigomoon to hold the shares in Kinbow, stating that the ownership would be the same as Apparel Solutions (50/50). Funds for the purchase of the Debtor were paid from Apparel Solutions' wholly owned subsidiary, GK Trading. GK Trading contributed its capital to the Kinbow IM account. From there, Sarika Gupta withdrew cash and deposited it into Kinbow's account without Julia's or my knowledge or agreement. From Kinbow LLC, Samarth and Sarika transferred $5.25 million directly to the Norris Trust account to pay to Wingspire for Ashley Stewart and Norris' fees. No money was ever deposited or paid from Indigomoon's account for the purchase of Ashley Stewart.  When Julia requested that her shares in Indigomoon be issued post-closing, Samarth said that Sarika Gupta "deserves" (without any payment) to have shares in Indigomoon and that Julia is only entitled to 25% in Kinbow, not 30% as agreed upon.  In March 2025, Samarth sent an email to the accountant Charles Yi stating that Julia's shares in Indigomoon are 41.6 % (equivalent of 25% in Kinbow LLC). Julia is entitled to 50% shares in Indigomoon by investment and verbal agreement and has confirmation from Samarth for at least 41.6% in writing twice.

19.     Monroe Capital ("MC") is the sole member of ASI Holding LLC ("ASI").   ASI owns a ten percent (10%) shareholder interest in the Debtor; Kinbow owns at a 90% stake in the Debtor in March 2024. Collectively, Kinbow and ASI own a one-hundred percent (100%) shareholder interest in the Debtor.

20.     I am a former Chief Executive Officer ("CEO") of the Debtor; such role ceased on or about October 2024.

21.    Julia and I served as directors of the Debtor until November 18, 2025, at which time both Julia and I resigned. Consequently, asserting our rights as the beneficial holders of the majority of the equity of the Debtor throughout entities, Julia and I acted to preserve the Debtor. By aggregating GIT's undisputed forty percent (40%) interest with Julia's rightful controlling interest in Indigomoon (which holds sixty percent (60%) of Kinbow), we collectively possess the requisite voting power to govern Kinbow and, by extension, the Debtor. Accordingly, on December 10, 2025, we executed a valid Stockholders' Written Consent to amend the Debtor's By-Laws and reconstitute the Board of Directors. In turn, as the duly appointed directors, we passed a formal resolution authorizing this Chapter 11 filing to seek the immediate protections of this Court to benefit the Debtor's creditors.

22.    As noted, G Ashley assumed the Debtor's 76 boutiques running across more than 20 states, and a strong e-commerce presence serving customers in the United States, Canada, and the United Kingdom.  The Ashley Stewart brand is deeply rooted in community engagement and empowerment. Recent initiatives include expanding into lifestyle categories, launching exclusive plus-size collections on Walmart.com, and introducing footwear lines. Guided by its mission to use business as a force for good, the Debtor blended cultural relevance with inclusivity, offering head-to-toe fashion solutions while fostering representation and confidence among its customers.

23.    In 2023, Samarth approached me seeking assistance in identifying a suitable retail acquisition target for vertical integration with Apparel Solutions Inc. ("AP"), which Samarth and Julia jointly own. I agreed and leveraged my expertise in mergers, acquisitions, and capital-raising. Together, Julia, Samarth and I formed Kinbow IM Holdings Inc. ("Kinbow IM") in Nevada for the purpose of acquiring distressed retail assets, initially pursuing iMedia – an unrelated company - through its bankruptcy auction. As understood between Samarth and me, ownership was to be

8

equal. After losing the iMedia bid, we continued searching and in February 2024, identified the Debtor as a viable acquisition via Guggenheim Partners ("Guggenheim").

24.     Guggenheim facilitated management meetings, data-room access, and lender engagement. Kinbow IM executed a Nondisclosure Agreement ("NDA") and Letter of Intent ("LOI") with MC and Wingspire Capital LLC ("Wingspire"). Kinbow IM received a $25,000,000 financing Indication of Interest ("IOI") from Wingspire. To establish Kinbow IM as a qualified purchaser with Wingspire, I submitted a comprehensive buyer profile with my credentials ("Buyer Profile"). Additionally, I provided proof of funds ("POF") in the amount of $5,000,000, demonstrating the immediate liquidity required to execute the acquisition of the Debtor. The NDA is attached as **Exhibit B**, LOI as **Exhibit C**, Buyer Profile as **Exhibit D**, POF as **Exhibit E**, and the IOI as **Exhibit F**.

25.     Most poignant, all documents were executed under Kinbow IM, not Kinbow.

26.     Despite the fact that all operative deal documentation, including the LOI, NDA, and lender term sheet, had been executed by Kinbow IM, Samarth unilaterally determined that a new entity, Kinbow, should be created, ostensibly for 'tax purposes'. Accordingly, on March 6, 2024, Samarth incorporated Kinbow LLC in Nevada (the "Kinbow Business Application") without convening a board meeting, without obtaining the written consent of other shareholders, and without formally assigning the rights to the acquisition documents from Kinbow IM to the new entity.

27.     The Kinbow Business Application is attached as **Exhibit G**. Upon information and belief, these ultra vires acts were committed with the specific intent to deceive Julia and me, allowing Samarth to fraudulently seize control of Kinbow LLC and, by extension, the Debtor.

4899-4260-0066, v. 1

28.     Samarth then instructed counsel at the time for the Debtor, Norris Law, to draft the purchase agreement of the Debtor under Kinbow, again without authorization by the board. No operating agreements or bylaws were ever properly adopted for either entity, and no directors or officers were formally appointed. This rendered all unilateral actions by Samarth and Sarika Gupta ("Sarika" and together with Samarth, the "Guptas") ultra vires, invalid, and unauthorized.  This was all orchestrated as an unlawful transaction to defraud creditors and strip me and Julia of our ownership and control of Kinbow, and, by extension, the Debtor.

29.     Subsequently, when the acquisition's funding requirements escalated, driven by an increase in the initial proposed enterprise value from $17.5 million (as detailed in the Kinbow Proposal dated February 2, 2024) to $23 million, the Guptas utilized this liquidity pressure to orchestrate a fraudulent scheme. Specifically, they sought to seize effective control of both Kinbow and Kinbow IM by systematically manipulating capital contribution records and unilaterally altering ownership percentages to disenfranchise the other equity holders.

30.     Rather than properly transferring investor contributions from Kinbow IM to Kinbow via wire or check, the Guptas withdrew $2,866,000 in cash from Kinbow IM via two (2) transactions: (i) $550,000 on March 7, 2024, and (ii) $2,316,000 on March 15, 2024. The Guptas then deposited it into Kinbow and misrepresented it as personal capital contributed by Sarika. The bank deposits are attached as **Exhibit H**. This money included $1,420,000 of GIT's investment, GK Trading LLC's ("GK") investment, and my affiliates' RA Acquisition, Decipher & VitPro's contributions. AP is the sole member of GK.

31.     Instead of allocating the sixty percent (60%) equity of Kinbow to GK, Samarth secretly formed Indigomoon in Nevada and parked the sixty percent (60%) equity stake there. He did this despite Indigomoon contributing no funds. This maneuver allowed the Guptas to seize

control of 60% of Kinbow and, post-closing, 90% of Ashley Stewart. As a result, he denied Julia her rightful equity in Indigomoon while the Gupta's entire equity contribution came from GK Trading, a combined entity owned by fifty percent (50%) by Samarth and Julia constituting fraud, oppression, and breach of fiduciary duty. See Exhibit A, which corroborates Julia's member-interest in Indigomoon through Samarth's email dated February 27, 2025.

32.     Kinbow then acquired the Debtor, at that time an operating entity,[3] in March 2024. Kinbow's operating agreement vested management authority in a board consisting of Julia, Samarth, and me. Initially, Julia and I served as directors and officers of the Debtor, and then I served as its CEO. On October 4, 2024, Samarth became CEO and CRO of the Debtor, and Sarika assumed the role of CFO.

33.     Despite lacking any formal accounting credentials required to act as a CFO, Sarika used her position to pressure auditors in manipulating the Debtor's profit and loss ("P&L") statements. The purpose of this manipulation was to create a false appearance of solvency while she & Samarth misappropriated company assets. Over the next few months, Sarika allowed accounts payable ("A/P") to balloon from $15,000,000 to $20,000,000 while sales declined.  They also disbursement meetings without me to bypass internal oversight, effectively failing to pay legitimate vendors/creditors to hoard cash for directing millions of dollars to related-party entities owned by Sarika and Samarth. The auditor's correspondence reflects pressure to alter the P&L statements and are attached as **Exhibit I**. The financial statements evidencing the increase in accounts payable from $15,000,000 to $20,000,000 during a sales decline are attached as **Exhibit J**. The disbursement meeting notes and directives showing transfers to related-party entities are attached as **Exhibit K**.

---

[3] The Debtor today is a non-operating company that was stripped of its assets.

4899-4260-0066, v. 1

34.     After these leadership changes, governance disputes of the Debtor, the operating entity that was acquired, escalated. Between April 21 and April 24, 2025, Samarth issued emergency notices and passed unauthorized resolutions attempting to remove Julia as a Kinbow manager, install his wife Sarika despite oral objections from Julia and me, cancel a duly noticed Kinbow meeting, and re-affirmed Samarth's unilateral authority, all in violation of Kinbow's notice and voting provisions. Despite these maneuvers, the Kinbow board convened on April 24, 2025, and delegated shareholder voting authority for the Debtor to Julia. Kinbow also removed Sarika from the Debtor's Board and amended bylaws to allow any member to call special board meetings. The Guptas ignored these actions, continued to act as officers, disconnected Julia's and my corporate email accounts, threatened to bar us from the Debtor's premises, and instructed staff not to respond to duly authorized directors.

35.     Upon information and belief, Head of Human Resource Mike Abate withheld corporate information at Samarth's direction, which communication is attached as **Exhibit L**. Samarth filed amendments unilaterally, renaming Kinbow IM to Finovo Inc ("Finovo Business App."). The Finovo Business App. is attached as **Exhibit M**. Julia's signature was forged on GK Trading documents to fabricate ownership percentages to show Samarth owns fifty-two percent (52%) (he actually only owns fifty percent (50%)) so he can assert control, misspelling Julia's name in the process.

36.     Without the Debtor's Board's knowledge, Samarth executed a $65,000,000 FedEx/Nimble third-party logistics ("3PL") contract for business-to-consumer fulfillment and a Dropp Ship 3PL contract for business-to-business ("B2B") fulfillment despite the availability of a cheaper, proven alternative identified by me, and the resulting transition failed catastrophically,

12

causing major fulfillment delays, B2B failures, and over $4,000,000 in lost revenue. The Debtor's 2024-2025 year-over-year sales are attached as **Exhibit N**.

37.    The Guptas engaged in extensive financial misconduct on behalf of the Debtor. On April 21, 2025, Sarika transferred funds from the operating accounts of affiliates AP and GK into Gaea LLC ("Gaea"), an entity wholly owned by the Guptas, reducing GK's balance from $576,516.50 to $5,260 and AP's balance from $300,950.25 to $2,651.25. On April 29, 2025, the Debtor wired $400,033.28 to Gaea while unauthorized disbursements continued, and Sarika retained the Debtor's banking access despite her removal.

38.    The Debtor's headquarters, in Secaucus, New Jersey, was past due in rent payments in the amount of $296,109.97 as of April 4, 2025. The Guptas attempted to terminate the lease on March 28, 2025, without board approval or payment of the termination fee. The Guptas further disabled payroll access of Julia, halted purchase orders, and instructed the Debtor's president Kristin Gaskin not to place orders with AP. With the declining sales coupled with drying up liquidity of the Debtor, lender Wingspire requested to infuse additional $1,000,000 capital by early May 2025.

39.    Due to the foregoing conduct and disputes, on or about April 24, 2025, Julia, individually and derivatively, on behalf and for the benefit of AP, individually and derivatively, on behalf and for the benefit of GK, individually and derivatively, on behalf and for the benefit of Indigo, Indigo individually and derivatively, on behalf and for the benefit of Kinbow, and Kinbow individually and derivatively, on behalf and for the benefit of the Debtor, filed an action in the Superior Court of New Jersey, Chancery Division, Somerset County, under Docket No. SOM-C-12027-25; under caption *Julia Klyashtorny, individually and derivatively, on behalf and for the benefit of Apparel Solutions Inc., individually and derivatively, on behalf and for the benefit of GK*

4899-4260-0066, v. 1

*Trading LLC, and individually and derivatively, on behalf and for the benefit of Indigomoon LLC; Indigomoon LLC, individually and derivatively on behalf of Kinbow, LLC; Kinbow, LLC, individually and derivatively on behalf of Ashley Stewart, Inc. v. Samarth Gupta, Sarika Gupta, Gaea LLC, Julia K, LLC, Global Information Technology, Inc., and Ashley Stewart, Inc.* (the "State Court Action").

40.     On April 25, 2025, the state court entered a Temporary Restraining Order ("TRO") prohibiting transfers from AP and GK. After service of the TRO on April 28, 2025, the Guptas transferred $8,640 from GK to Samarth's personal account on April 29, 2025, in direct violation of the TRO, and continued their misconduct thereafter.

41.     There have been several amendments to the complaint filed in the State Court Action, with the most recent being the Third Amended Complaint filed on November 7, 2025. On March 28, 2024, the Debtor, Kinbow, AS IP Brands LLC ("ASIP"), and Butterfly Giftcard Inc. ("Butterfly" and together with the Debtor, Kinbow, and ASIP, the "Affiliated Loan Parties"), entered into a Credit Agreement with Wingspire, granting Wingspire a first-priority lien on substantially all of the Affiliated Loan Parties' assets. The Guptas' mismanagement and diversion of funds caused defaults and forbearance under the Credit Agreement, impairing liquidity and governance and preventing compliance with lender requirements thereby harming the Debtor.

42.     When Wingspire grew concerned, it appointed Curt Kross as CRO and Stu Kessler as Independent Director and placed the Debtor under a forbearance arrangement (the "Forbearance Agreement"). The Forbearance Agreement is attached as **Exhibit O**. Julia and I proposed a highly beneficial partnership with Julia and my successful brand Especially Yours, but Samarth blocked the proposal harming the Debtor and leading Stu Kessler to resign. Stu Kessler' resignation letter is attached as **Exhibit P**.

14

43.    A mediation was conducted in the State Court Action before retired Judge Carroll, during which Samarth demanded $16,000,000 for his stake while offering me and Julia only $2,000,000 for ours, an offer structure that signaled no genuine intent to settle. The mediation summary is attached as **Exhibit Q**. Following the mediation, Wingspire met all of us (Samarth, Sarika, Julia and me) at Debtor's Secaucus, New Jersey office around October 15, 2025, and warned that failure to resolve the litigation would trigger an Auction (defined herein).

44.    On November 20, 2025, Wingspire conducted a purported UCC Auction (the "Auction") at which substantially all assets of the Debtor were sold to the highest bidder, upon information and belief, to G Ashley Inc. ("G Ashley"). The transfer is disputed by the Debtor and alleged to be tainted by insider misconduct and lack of transparency.

45.    Upon information and belief, G Ashley Inc. was the successful bidder at the auction. That said, however, I am unable to locate G Ashley in public records.  I have repeatedly asked several parties (Wingspire's counsel, G Ashley, and prior counsel for Ashely Stewart) for a copy of the executed asset purchase agreement and am yet to receive a copy. My counsel in the bankruptcy matter has also asked counsel for Wingspire and G Ashley for a copy. Counsel for Wingspire suggested my counsel email the buyer's counsel. My counsel emailed buyer's counsel and is yet to receive a copy of the agreement. My counsel also emailed Mandelbaum Barrett ("MB") and requested a copy. MB advised it has a conflict with RA Capital and would ask its conflicts counsel to respond to my counsel.

46.    Upon information and belief, Wingspire represented to the bidders prior to the Auction, that $5,000,000 would be required by the successful bidder upfront, and that the bidder must advise which liabilities of the Debtor the bidder would be assuming. Upon information and belief, at the Auction, Wingspire increased the cash requirement to be not only $5,000,000 upfront,

15

but required an additional $5,000,000 due at closing, which Wingspire required to occur within five (5) days, by November 25, 2025, because should the bidder fail to close, Wingspire wished to liquidate the Debtor's collateral, specifically as to apparel, prior to Black Friday, on November 28, 2025.

47.    Julia and I, who were the only other bidders at the Auction other than the Guptas, through our newly formed entity Ashley Stewart Holding, Inc., a Texas corporation.  We expressed to Wingspire that we had secured the upfront financing of $5,000,000 as originally required, but expressed it would be impossible to secure the additional $5,000,000 in only five (5) days and requested ten (10) days to close. Allegedly, the Guptas' offer was for $4,800,000 up front, and would provide $5,000,000 at closing on Tuesday, November 25, 2025. Upon information and belief, the closing of the Auction did not occur on Tuesday, November 25, 2025, but rather occurred around December 5, 2025. This contradicts Wingspire's position that the Auction had to close prior to Black Friday and suggests Wingspire's lack of good faith as the reason for denying Julia and my bid on grounds we could not have ten (10) days to close to secure the additional funds.

48.    Samarth's bid included assumption of approximately $47,000,000 in junior lien liabilities but did not assume approximately $3,200,000 in mezzanine debt owed to RA Capital Funding LLC[4] ("RA"), Amarje LLC ("Amarje"), AP, and Adrika, each a mezzanine lender with recorded lien filings, thereby leaving those liens in place and causing the assets transferred under the bid to remain encumbered, undermining any claim of clean title and the commercial reasonableness of the Auction. G Ashley does not appear in any Secretary of State records nationwide, the use of a disguised buyer violates the transparency requirements of Article 9 of

---

[4] I am the sole member of RA.

16

UCC and renders the Auction voidable. I requested the lender, CRO and lender's counsel to provide me a copy of the executed asset purchase agreement by G Ashley and/or provide a list of all liabilities assumed including secured debt, mezzanine debt, and unsecured debt, etc. Despite my request, I have not received anything from them to date.

49.     Kinbow and ASI were aware that the Auction was to take place, however, they lacked sufficient information regarding priority payment structure and creditor treatment until after the Auction concluded leaving them in the dark. The Debtor intends to file an order to show cause, and initiate an adversary proceeding, for immediate relief to prevent further dissipation of Debtor's assets, unwind the improper Auction, and address fraudulent transfers, successor liability, and lender misconduct, amongst other relief. Wingspire refused to return my $878,000 deposit unless I signed a second confirmation agreement promising not to contest the Auction sale, a coercive demand that is potentially unenforceable. The deposit-return confirmation is attached as **Exhibit R.**

50.     The auction process was commercially unreasonable, including but not limited to (i) arbitrary closing deadline changes, (ii) exclusion of bona fide bidders, (iii) failure of the winning bidder to close on stated terms, and (iv) selective assumption of liabilities leaving the mezzanine liens intact and not paid. The Debtor asserts the Auction is voidable and intends to seek turnover and avoidance relief.

51.     Upon information and belief, the below creditors were also not paid from the sale proceeds or assumed by the buyer, despite most having outstanding balances aged more than 180 days:

| Sl.no. | Vendor | Amount Due |
|---|---|---|
| 1 | 11:11 SYSTEMS | $15,289 |
| 2 | Afro Chick Corporation | $3,438 |
| 3 | Air Handlers Mechanical Services, Inc. | $1,551 |

17

| 4 | American Bazi | $5,151 |
| 5 | Amerje (unsecured portion excl mezz debt) | $130,000 |
| 6 | Ant USA, Inc. | $17,000 |
| 7 | Attentive Mobile Inc. | $37,571 |
| 8 | Axonify Inc. | $31,800 |
| 9 | Brownstein Hyatt Farber Schreck, LLP | $4,182 |
| 10 | Clm Midwest | $1,294 |
| 11 | Cognax Tech LLC | $6,000 |
| 12 | Consolidated Maintenance dba Authority Hvac | $120,074 |
| 13 | Content Square Inc. | $16,840 |
| 14 | Dreamwear Inc | $180,490 |
| 15 | FDS Holdings Inc. (A Subsidiary of Fiserv) | $1,687 |
| 16 | Fenom Digital | $13,391 |
| 17 | Fox Glass Co., Inc. | $5,821 |
| 18 | Fox Smith, LLC | $27,418 |
| 19 | Freezing Point Air Conditioning LLC | $1,098 |
| 20 | Friendbuy Inc. | $3,000 |
| 21 | Global Security Solutions, LLC | $8,156 |
| 22 | ICP Solutions Ltd | $13,000 |
| 23 | Identicom Sign Solutions, LLC | $11,525 |
| 24 | Imagesrs, LLC | $7,592 |
| 25 | Jackson Lewis P.C. | $13,686 |
| 26 | JP Air Systems, LLC | $12,300 |
| 27 | Kelley Drye & Warren LLP | $8,589 |
| 28 | Linkedin Corporation | $13,061 |
| 29 | Listrak Inc. | $170,184 |
| 30 | Littler Mendelson PC | $8,766 |
| 31 | Liz White, Ex CMO | $150,000 |
| 32 | LP Software Inc | $3,414 |
| 33 | MMS USA Investments | $63,633 |
| 34 | Noibu Technologies Inc. | $53,308 |
| 35 | Optimizely North America, Inc. | $85,050 |
| 36 | Profile Industries | $56,950 |
| 37 | Robin Hefler, Ex CFO | $150,000 |
| 38 | Springboard Research Inc. | $3,167 |
| 39 | STP Brokerage | $125,697 |
| 40 | Superclean Service Company | $5,539 |
| 41 | Tmgusa, LLC | $1,485 |
| 42 | Trintech Inc. | $10,948 |

4899-4260-0066, v. 1

| 43 | VitPro LLC | $130,000 |
| 44 | WIS International | $1,955 |
| | **Total** | **$1,731,099** |

52.     Thus, there is $1,731,099 due to creditors of the Debtor. These were not paid nor assumed through the sale.

## CIRCUMSTANCES LEADING TO BANKRUPTCY

53.     As outlined above, the Debtor commenced this case to address the improper UCC Auction by seeking the turnover of the Debtor's assets transferred to G Ashley. Broadly, this filing serves to preserve the Debtor's estate, allowing it to restructure its liabilities and emerge as a viable, reorganized entity and satisfy creditors that were unpaid as a result of the sham auction.

54.     The filing was not commenced for litigation advantage. State court remedies were inadequate to address the removal and continued control of the Debtor's assets following a disputed Article 9 UCC Auction and foreclosure, leaving bankruptcy as the only forum capable of providing centralized relief.

55.     Immediate relief was required because assets were being dissipated outside the Debtor's control, leaving no ability to preserve value for creditors absent the protections of Chapter 11.

## CAPITAL STRUCTURE

## Debt

## A.  Secured Debt

56.     The Debtor is still reviewing its books and records and reserves the right to amend this Declaration, if necessary.

57.     Wingspire was the Debtor's primary secured senior creditor pursuant to the Credit Agreement.

58.     RA is a junior secured mezzanine lender of the Debtor, currently owed $3,000,000.

I am the sole member and CEO of RA.[5]

59.     Amarje is a junior secured mezzanine lender of the Debtor, currently owed

$185,000. Julia is the sole member of Amarje. Amaraje is both a Mezzanine lender and unsecured

creditor as Julia was providing her 1099 consulting services to the Debtor through Amarje and is

currently owed $130,000. Pursuant to an Assignment of Creditors' Rights Agreement, dated

December 5, 2025, Amarje assigned its unsecured receivable account owed to it by the Debtor, in

the amount of $40,000, to BLM Sourcing Inc., an independent agency purchasing debts owed to

creditors of the Debtor.

60.     Loans extended to the Debtor by entities RA, Amarje and AP, are affiliated with

insiders Julia and myself.  These relationships are fully disclosed, and the Debtor is not seeking to

elevate any insider claims, which will remain subject to review, objection, and equitable

subordination as determined by this Court.

61.     The Debtor acknowledges these insider relationships transparency and does not

seek any preferential treatment of such claims, which remain subject to objection,

recharacterization, or equitable subordination.

**B.  Unsecured Debt**

62.     The Debtor is still reviewing its books and records to determine the entire unsecured

debt owed.

63.     The Debtor is conducting due diligence as to other outstanding unsecured debt and

will review claims as filed during the pendency of the case.

---

[5] Id.

## CHAPTER 11 FILING

64.    The Debtor filed its voluntary Chapter 11 petition on December 17, 2025. ECF 1.

## PURPOSE OF FILING

65.    The Debtor filed for bankruptcy to recover its assets from G Ashley and to prevent it from selling or disposing of such assets which are vital to the Debtor's operations, out of the ordinary course of business. Once the assets are returned, the Debtor will restructure its debt to reorganize and emerge in a healthier financial position so it can satisfy creditors. Following the recent Auction in which the Debtor's assets were stripped and sold to G Ashley, the Debtor initiated this bankruptcy case rather than proceed in the State Court Action, as the Auction and resulting loss of assets necessitated immediate intervention and turnover relief as such assets are property of the bankruptcy estate.

## FIRST DAY MOTION

### Motion for Authority to Continue to Use Existing Bank Accounts

66.    The Debtor has ten bank accounts ("Bank Accounts") held at Fifth Third Bank ("Fifth Bank"), JP Morgan Chase ("Chase"), and Bank of America ("BofA" and together with Fifth Bank, and Chase, collectively, the "Banks").

67.    Despite the UCC Auction sale, the Debtor's bank account at Fifth Bank is still being utilized to deposit revenues from business operation. The Debtor has eight (8) accounts with Chase: (i) gift card operations account, (ii) payroll account, (iii) commercial checking account for DACA Account for Wingspire, (iv) commercial checking account for expenses reimbursement, (v) commercial money market account, (vi) two checking accounts, and (vii) a checking account for merchandise payable account.

21

68.     Despite the purported sale, revenues continue to flow through existing accounts of the Debtor, which constitute property of the Debtor's estate.

69.     Continued use of existing bank accounts is necessary to preserve payroll, tax compliance, and operations, subject to Court oversight.

70.     The Debtor's account at BofA is a business checking account.

71.     In the ordinary course of business, the Debtor utilizes the Bank Accounts to receive deposits and issue disbursements via check, wire transfer, and ACH. To comply with United States Trustee guidelines, the Debtor will manually stamp or imprint the legend "Debtor-in-Possession" on all existing check stock. When the Debtor replenishes its supply, it will ensure that "Debtor-in-Possession" is pre-printed on the face of all new checks.

72.     Any continued use of existing bank accounts is solely for the limited purpose of preserving funds, maintaining ordinary-course operations, and subject at all times to the oversight and approval of this Court.

73.     The Debtor desires to maintain all bank accounts at the Banks since it enjoys a productive, professional relationship with the Banks. In addition, all of the Banks are approved depositories with the Office of the United States Trustee for the District of New Jersey.

Pursuant to 28 U.S.C. § 1746, I swear under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

By:   /s/*Ram Ajjarapu*
      RAM AJJARAPU

Dated:  December 17, 2025

22

4899-4260-0066, v. 1